**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **NATIVE PIXEL INC.,** | |
| Plaintiff, | Civil Action No. 2:26-cv-00205 |
| v. | |
| **WAVEMAKER, INC.,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 et seq., in which Plaintiff Native Pixel Inc. ("Plaintiff") makes the following allegations against Defendant WaveMaker, Inc. ("Defendant" or "WaveMaker"):

## PARTIES

1. Plaintiff Native Pixel Inc. ("Native Pixel" or "Plaintiff") is a Florida corporation with its principal place of business at 8018 Laurel Ridge Court, Delray Beach, FL 33446.

2. On information and belief, Defendant WaveMaker, Inc. ("WaveMaker" or "Defendant") is a corporation duly organized and existing under the laws of the State of Delaware. It has a place of business and is headquartered at 4965 Preston Park Blvd, Suite 825, Plano, Texas 75093. WaveMaker may be served with process through its registered agent, VCORP SERVICES, LLC, located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

3. On information and belief, WaveMaker directly develops, designs, manufactures, uses, distributes, markets, offers to sell and/or sells infringing products and services in the United States, including in the Eastern District of Texas, and otherwise directs infringing activities to this District in connection with its products and services as set forth in this complaint. This includes

1

but is not limited to at least the following: Web Studio, React Native Studio, AutoCode, DevX, UX Design, Cloud Platform, and Security.

## INTRODUCTION

4.    This complaint arises from Defendant's unlawful infringement of the following United States patents owned by Plaintiff, which generally relate to graphical user interface technology: United States Patent Nos. 11,816,459 (the "'459 Patent") and 12,118,335 (the "'335 Patent") (the "Asserted Patents" or the "Patents-in-Suit").

5.    The patents held by Native Pixel, Inc. cover foundational technology at the core of this market transformation—technology that was conceived, developed, and patented years before many current market participants entered the space. The broad applicability of the patented technology extends across traditional web and mobile development, cloud-based design tools, low-code/no-code platforms, AI-powered code generation systems, IoT device interfaces, automotive software systems, and interactive media platforms.

6.    The Patents-in-Suit claim specific inventions addressing the core technical challenges of cross-platform GUI development, including systems for abstracting user interface characteristics into environment-independent formats, methods for automatically generating platform-native source code from design inputs, and architectures for cloud-based streaming and dynamic updating of user interface components without requiring application redeployment. These patented innovations are now widely practiced across the low-code and no-code development industry, including in the products and services manufactured, sold, and deployed by Defendant.

7.    The Asserted Patents represent foundational innovations in the design-to-code technology space that predate the vast majority of competing products and platforms now operating in this rapidly expanding market. The inventions arose from the pioneering work of

2

inventor Frank Parsolano, III, and his co-inventor Arnie Foxx at ZigiSoft, LLC, who recognized as early as 2016 that the traditional software development paradigm—in which graphic designers created visual mockups that developers then painstakingly recreated as handwritten, platform-specific code—was fundamentally inefficient, unsustainable, and incapable of keeping pace with the explosive proliferation of platforms, device types, and screen sizes.

8.    Mr. Parsolano filed the foundational patent application (U.S. Application Serial No. 15/352,834) on November 16, 2016, disclosing for the first time a comprehensive system for automatically abstracting graphical user interface design elements into an environment-independent format and then generating native, human-readable source code for multiple target platforms—including iOS, Android, Windows, HTML5, and web frameworks—from a single design input. This breakthrough, first publicly unveiled at DeveloperWeek 2017 in San Francisco under the PixelFree Studio brand, solved a core technical problem that had long plagued the software industry: the inability to decouple user interface design from platform-specific implementation without sacrificing code quality, performance, or developer control.

9.    The patented technology introduced, *inter alia*, recursive template selection for native code generation across multiple programming languages, cloud-based storage and streaming of UI components enabling runtime updates without requiring application recompilation or redeployment through app stores, real-time data binding connecting UI elements directly to APIs and web services during the design phase, and a collaborative marketplace architecture for sharing and monetizing reusable UI components.

10.    These inventions were not incremental improvements to existing tools; they constituted a paradigm shift in how software user interfaces are created, deployed, and maintained—replacing a manual, error-prone, and duplicative process that industry estimates

suggest consumed 60–80% of front-end development time with an automated, one-click system that generates clean, production-ready code indistinguishable from that written by experienced professional developers. The breadth and foundational nature of these patented innovations is confirmed by the fact that the inventions are now being used by companies around the world, including WaveMaker.

11. PixelFree Studio, Inc., a Nevada corporation ("PixelFree Studio" or "PixelFree") is a pioneering software development company headquartered in Delray Beach, Florida, with major development operations in Saarbrücken, Germany. PixelFree Studio has developed a revolutionary, patented design-to-code platform that enables designers and developers to transform graphical user interface designs into production-ready, human-readable native code across multiple programming languages and platforms with a single click. PixelFree Studio's technology reduces front-end development time by up to 80%, converting projects that once took months into tasks completed in minutes.

12. PixelFree Studio's patented software generates clean, human-readable PRO-Code in six programming languages—HTML5, Vue.js, React, Angular, C# (desktop), and C# (web app)—producing output that is indistinguishable from code handwritten by experienced professional developers. Unlike competing tools that rely on proprietary libraries or pre-built frameworks, PixelFree Studio generates truly native code, affording users complete ownership, full hosting flexibility, and unlimited customization. The platform supports seamless Figma project importation, advanced vector graphics handling, responsive design capabilities, and cross-platform consistency, ensuring that applications perform identically across Windows, macOS, iOS, Android, Linux, and web environments.

13.     PixelFree Studio was co-founded by Philipp Geppert (CEO), Solomon Hartman (President), Arnie Foxx (Founder), and Felix Förster (CFO). The company's genesis traces to foundational work in graphical user interface programming systems, with its earliest patent applications filed as early as 2016. The late Solomon Hartman (d. May 2025) was instrumental in shaping the company's intellectual property strategy and commercialization efforts. PixelFree Studio's technical team includes specialists in deep learning, AI, and software engineering, with personnel holding advanced degrees including PhDs in computer engineering. Native UI, Inc., a Florida corporation ("Native UI"), spun off from PixelFree Studio on or about November 28, 2022, to separately pursue development and commercialization of the technology.

14.     PixelFree Studio and Native UI are the developers and original owners of a foundational patent portfolio that covers revolutionary design-to-code automation technology, including the Patents-in-Suit: U.S. Patent No. 11,816,459 (issued November 14, 2023, with priority relating back to November 16, 2016), protecting methods for generating, streaming, and deploying user interfaces across multiple platforms without requiring recompilation or redeployment of applications; and U.S. Patent No. 12,118,335 (issued October 15, 2024, with priority relating back to November 16, 2016), covering the complete UI platform ecosystem, including design file parsing, template selection, native code generation, data-aware components, and marketplace functionality.

15.     PixelFree Studio has received significant market validation for its innovative technology. The company has twice been awarded the prestigious European Union Seal of Excellence—a quality label awarded by the European Commission to proposals submitted under Horizon Europe calls that meet rigorous quality thresholds—recognizing PixelFree Studio's industry-leading innovations in design-to-code technology, accessibility solutions, and

5

sustainability practices. PixelFree Studio showcased its revolutionary software at Web Summit 2023 in Lisbon, Portugal—one of the world's premier technology conferences—and has been featured at SaaS Open in Austin, Texas, among other industry events. The company secured separate loans of One Million Euros (€1,000,000) and Five Hundred Thousand Euros (€500,000) from Effre (a European governmental lending source) to accelerate development and commercialization of its platform, further validating market confidence in its technology.

16.    In addition to its flagship design-to-code platform, PixelFree Studio developed NinjaScan.ai, a next-generation website auditing platform that scans websites for accessibility compliance and digital sustainability. NinjaScan.ai conducts comprehensive audits against WCAG 2.2, EN 301 549, and WSG 1.0 standards, providing detailed reports with actionable recommendations, automatic issue remediation, accessibility statement generation, and a complementary accessibility widget. The platform reflects PixelFree Studio's commitment to fostering digital inclusivity and environmental sustainability in software development.

17.    PixelFree Studio strategically maintains dual operations in the United States and Europe. Its European development center in Saarbrücken, Germany, is situated in one of Europe's foremost technology corridors, home to the Max Planck Institute for Software Systems, the German Research Center for Artificial Intelligence (DFKI), the Korea Institute of Science and Technology (Europe), and more than a dozen major research universities specializing in computer science. This strategic positioning enables PixelFree Studio to attract and retain world-class engineering talent, supplementing its U.S. headquarters in the innovation-rich environment of South Florida.

18.    Native Pixel, Inc. ("Native Pixel") is the intellectual property holding and enforcement arm of the PixelFree Studio and Native UI family of companies. Native Pixel was

established to hold, manage, protect, and enforce the valuable patent portfolio developed by and originally assigned to PixelFree Studio, Native UI and their affiliated entities. Native Pixel serves as the centralized vehicle for intellectual property monetization, licensing, and enforcement activities related to the foundational design-to-code patents developed through years of substantial research, development, and investment by PixelFree Studio's and Native UI's engineering teams.

19.    Native Pixel, Inc. is an affiliate of PixelFree Studio, Inc. and Native UI, Inc. The Patents-in-Suit were developed through the substantial research and development efforts of PixelFree Studio's and Native UI's world-class engineering and design teams, building on foundational work dating back to 2016. The patent portfolio was subsequently assigned to Native Pixel, Inc. to consolidate intellectual property management and enforcement within a dedicated corporate entity, allowing PixelFree Studio to focus its operational resources on continued product development, innovation, and market expansion.

20.    Native Pixel, Inc. is the current owner by assignment of all right, title, and interest in and to the patents asserted in this action, including U.S. Patent Nos. 11,816,459 and 12,118,335. As the assignee and current owner of these patents, Native Pixel, Inc. possesses all rights necessary to bring and maintain this action for patent infringement, including the right to collect damages for past, present, and future infringement as well as injunctive relief. The Patents-in-Suit are properly assigned to Native Pixel, Inc., and Plaintiff has full standing to bring this lawsuit.

21.    Native Pixel's mission is to protect and maximize the value of the pioneering innovations created by the PixelFree Studio and Native UI development organization. The patents held by Native Pixel represent years of intensive research and development, significant financial investment, and breakthrough innovation in the design-to-code space. The design-to-code

7

solutions market represents one of the most rapidly growing segments of the global software development industry, constituting a multi-billion dollar and rapidly growing addressable market.

22.    WaveMaker, Inc. manufactures, uses, tests, sells, offers to sell, and deploys products and services that practice the inventions claimed in the Patents-in-Suit. On information and belief, WaveMaker is a privately held enterprise software company headquartered in Plano, Texas, that develops and commercially markets an AI-powered application development platform used by over 200 large enterprise customers across more than 15 countries in regulated industries including fintech, banking, telecommunications, insurance, and healthcare. WaveMaker is a subsidiary of Pramati Technologies, a Hyderabad, India-based software product company founded in 1998 by brothers Jay Pullur and Vijay Pullur. Vijay Pullur serves as WaveMaker's Chief Executive Officer and is widely recognized as a co-founder and principal leader of the WaveMaker business within the Pramati corporate family.

23.    On information and belief, WaveMaker's founding and leadership team also includes senior engineering executive Deepak Anupalli, who has been publicly identified as a co-founder or founding leader of WaveMaker and has played a central role in rebuilding and evolving the WaveMaker low-code platform following its acquisition by Pramati.

24.    WaveMaker is a subsidiary of Pramati Technologies, a Hyderabad, India-based software product company. Under Pramati, WaveMaker was rebuilt from the ground up with modern JavaScript frameworks and re-launched as a commercial low-code platform. WaveMaker has been recognized by Forrester, Omdia, Everest Group, and multiple other independent industry analysts as a leading low-code development platform.

25.    WaveMaker's core platform generates clean, standards-based, open-source code using Angular for web applications and React Native for mobile applications, with Java-based

backends using Spring and Hibernate frameworks. A central feature of WaveMaker's platform is its visual WYSIWYG (What You See Is What You Get) design studio, which provides a drag-and-drop design canvas with pre-built widgets, themes, and layouts. The platform abstracts user interface design elements into an environment-independent format and then automatically generates native, production-ready source code across multiple target platforms from a single design input—the fundamental architecture claimed in the Patents-in-Suit. WaveMaker markets its generated code as fully portable with "zero vendor lock-in," meaning developers can export, modify, and maintain the generated code independently of WaveMaker's platform.

26.     On or about February 2025, WaveMaker commercially launched its AutoCode product, an AI-powered Figma plugin that converts visual UI designs—i.e., graphics and images created in Figma design files—into fully functional, production-ready application code. AutoCode performs automatic component detection that identifies and classifies graphical design elements such as forms, lists, cards, and navigation structures, then maps them to corresponding WaveMaker Studio code widgets. The system translates Material 3-based Figma designs into pixel-perfect front-end code, preserving design tokens, color systems, typography, spacing, and interaction patterns from the original visual design. AutoCode supports both standard Material 3 design systems and client-proprietary design language systems, and can be configured to recognize and convert custom design patterns into code—directly practicing the design file parsing, template selection, and native code generation methods claimed in the Patents-in-Suit. These representations are confirmed by WaveMaker's own public announcements and third-party coverage of the AutoCode launch. (See, inter alia, https://www.globenewswire.com/news-release/2025/02/04/3020083/0/en/WaveMaker-Launches-AI-powered-Design-to-Code-Accelerator-for-Pixel-Perfect-UI-Development.html (last visited March 15, 2026);

https://docs.wavemaker.com/learn/figma-autocode-plugin/working-with-autocode-plugin/    (last visited March 15, 2026); https://www.wavemaker.com/autocode/ (last visited March 15, 2026)).

27.    WaveMaker also offers CoPilot, a generative AI-powered assistant embedded within WaveMaker Studio that enables prompt-based UI generation—allowing developers to describe desired user interfaces in natural language text and have the AI automatically generate corresponding UI code. CoPilot capabilities include text-to-UI generation for creating forms, wizards, charts, lists, cards, and complete application interfaces from text prompts; API-aware generation that consumes OpenAPI/Swagger specifications to understand data structures and automatically generate UI components with proper data binding; and API creation where CoPilot defines and generates APIs based on application requirements and then integrates them with UI components. Together, AutoCode and CoPilot provide complementary design-to-code and prompt-to-code acceleration pathways.

28.    On or about February 19, 2026, WaveMaker publicly announced the availability of an 'agentic' application generation system (the 'Agentic App Generation Platform') featuring a proprietary "Two-Pass Coding System." In the first pass, AI ingests Figma design files and/or natural-language prompts and generates a tech-stack-agnostic application markup or meta-model that abstracts user interface and application architecture characteristics into an environment-independent format (sometimes referred to internally as 'WaveMaker Markup Language' or 'WML'). In the second pass, a deterministic code generation engine converts the validated application markup into production Angular, React JS, or React Native code, using an architecture-first methodology to maintain a standardized, structured development pattern. This Two-Pass architecture directly practices the core inventive concept of the Patents-in-Suit: abstracting graphical user interface design elements into an environment-independent intermediate

format and then automatically generating native, platform-specific source code from that abstracted representation. Regardless of the precise branding, WaveMaker's own public descriptions confirm that the accused agentic platform employs a two-step process in which Figma designs and natural-language prompts are first converted into a standardized, stack-agnostic application markup with architectural guardrails, which is then compiled into production code via a deterministic engine—exactly the abstract-then-generate architecture claimed in the Patents-in-Suit. WaveMaker's public press release and independent industry coverage of this 'agentic application generation system' expressly describe a two-pass code generation methodology in which Figma designs and natural-language prompts are first converted into a tech stack-agnostic application markup verified by developers and then transformed via a deterministic engine into production code. (See, inter alia, https://www.globenewswire.com/news-release/2026/02/19/3241064/0/en/WaveMaker-Fuses-Design-and-Development-with-Architecture-first-Agentic-Application-Generation-System-for-Enterprise-Dev-Teams.html (last visited March 15, 2026); https://www.devdiscourse.com/article/technology/3811412-wavemaker-unveils-cutting-edge-agentic-application-generation-system (last visited March 15, 2026); https://www.msp-channel.com/news/71748/wavemaker-launches-genai-application-development-system (last visited March 15, 2026)).

29.    WaveMaker's product suite—including at least its Web Studio, React Native Studio, AutoCode, DevX, UX Design, Cloud Platform, and Security offerings—embodies the core inventive concepts of the Asserted Patents. Specifically, WaveMaker's platform provides a visual WYSIWYG design canvas that abstracts user interface design elements into an environment-independent format and then automatically generates native, production-ready source code across multiple target platforms from a single design input—the fundamental architecture claimed in the

Patents-in-Suit. WaveMaker has further emphasized, in public announcements of its agentic application generation system, that its new platform uses a 'two-pass' code generation methodology in which design inputs and prompts are first converted into a standardized, tech-stack-agnostic application markup that is reviewed by developers and then transformed into enterprise-grade code by a deterministic engine, confirming its adoption of an abstract-then-generate architecture materially consistent with the Patents-in-Suit.

30.    WaveMaker's AutoCode product, an AI-powered Figma plugin, converts Figma UI designs into fully functional front-end components, layouts, and styles within minutes, performing automatic component detection that identifies design elements such as forms, lists, and cards and maps them to corresponding code widgets—directly practicing the design file parsing, template selection, and native code generation methods claimed in the Patents-in-Suit. WaveMaker's Web Studio generates enterprise-grade Angular code for web applications, while its React Native Studio generates cross-platform native mobile applications for both iOS and Android from a single codebase, enabling one-click deployment to the cloud provider of the customer's choice and packaging for distribution through the Apple App Store, Google Play Store, and Windows Store— practicing the cross-platform GUI generation and cloud-based streaming and deployment methods claimed in the Patents-in-Suit.

31.    WaveMaker's platform further supports real-time API integration, enabling UI elements to connect directly to backend services and data sources; a reusable prefab component system that serves both web and mobile application architectures as a marketplace of shareable, modular UI components; and cloud-based deployment infrastructure that allows applications to receive updated interfaces and features without requiring rebuilding, repackaging, or redeployment.

12

32.     WaveMaker actively markets, sells, and distributes these infringing products and services throughout the United States, including in the Eastern District of Texas, through its website, direct enterprise sales, and channel partnerships, deriving substantial revenue from customers who use the platform to build and deploy applications that are used by millions of consumers and business users worldwide.

33.     On information and belief, WaveMaker maintains its principal United States headquarters and a regular and established place of business in this District at 4965 Preston Park Blvd, Suite 825, Plano, Texas 75093. WaveMaker is registered with the Texas Secretary of State as a foreign for-profit corporation authorized to transact business in Texas (Texas Secretary of State file number 0804046072). WaveMaker's Plano headquarters serves as its primary domestic base of operations from which it develops, markets, sells, and supports the Accused Products, including its Web Studio, React Native Studio, AutoCode, DevX, UX Design, Cloud Platform, and Security products and services.

34.     On information and belief, WaveMaker employs personnel in this District at its Plano headquarters in positions directly related to the development, sale, and support of the Accused Products, including sales, account management, customer success, and business development roles. WaveMaker publicly advertises on its website at https://www.wavemaker.com/careers/ (last visited March 15, 2026), which, as of that date, listed multiple open positions identified as being based at WaveMaker's Plano, Texas headquarters.

35.     From its Plano headquarters, WaveMaker sells and offers to sell its infringing products and services to customers throughout the United States and in over 15 countries, including large enterprises in regulated industries such as fintech, banking, telecommunications, insurance, and healthcare. On information and belief, WaveMaker derives substantial revenue from the sale

and licensing of its infringing platform to customers who use it to build and deploy applications used by millions of consumers and business users worldwide.

## JURISDICTION AND VENUE

36. This action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq., including 35 U.S.C. §§ 271, 281, 283, 284, and 285. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

37. This Court has personal jurisdiction over Defendant in this action because Defendant has committed acts within this District giving rise to this action, and has established minimum contacts with this forum such that the exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice. Defendant, directly and through subsidiaries or intermediaries, has committed and continues to commit acts of infringement in this District by, among other things, making, using, offering to sell, and selling products that infringe the Asserted Patents, and inducing others to infringe the Asserted Patents in this District. Defendant is directly, and through intermediaries, making, using, selling, offering for sale, distributing, advertising, promoting, and otherwise commercializing its infringing products and services in this District. Defendant regularly conducts and solicits business in, engages in other persistent courses of conduct in, and derives substantial revenue from goods and services provided to the residents of this District and the State of Texas.

38. Defendant is subject to jurisdiction pursuant to due process and the Texas Long Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.041 et seq., due to its substantial business in this State and District including at least its infringing activities, regularly doing or soliciting business at its Texas headquarters, and engaging in persistent conduct and deriving substantial revenues

from goods and services provided to residents in the State of Texas including the Eastern District of Texas.

39.    WaveMaker, directly and/or through subsidiaries or intermediaries, has purposefully and voluntarily placed one or more infringing products and/or services in the stream of commerce with the intention and expectation that they will be purchased and used by consumers and enterprises in the Eastern District of Texas. WaveMaker's low-code application development platform, including its Web Studio, React Native Studio, AutoCode, DevX, UX Design, Cloud Platform, and Security products and services, have been and continue to be offered, sold, and used in the Eastern District of Texas.

40.    Venue is proper in this District under 28 U.S.C. § 1400(b) because Defendant WaveMaker, Inc. maintains a regular and established place of business in this District, including at its principal United States headquarters located at 4965 Preston Park Blvd, Suite 825, Plano, Texas 75093, and has committed acts of infringement in this District. Additionally, on information and belief, Defendant has transacted business in this District and has committed acts of direct and indirect infringement in this District by, among other things, making, using, offering to sell, selling products and services that infringe the Asserted Patents. Defendant has solicited business in the Eastern District of Texas, transacted business within this District, and attempted to derive financial benefit from the residents of this District, including benefits directly related to Defendant's infringement of the Asserted Patents.

41.    As set forth above, WaveMaker maintains its principal United States headquarters and a regular and established place of business in this District at 4965 Preston Park Blvd, Suite 825, Plano, Texas 75093. WaveMaker's maintenance of a staffed headquarters facility, from which it conducts substantial business operations including the development, marketing, sale, and support

of the Accused Products, constitutes a regular and established place of business within the meaning of 28 U.S.C. § 1400(b).

42.    As set forth above, WaveMaker employs personnel in this District at its Plano headquarters in positions directly related to the development, sale, and support of the Accused Products. WaveMaker publicly advertises employment positions based at its Plano, Texas headquarters and actively seeks to hire additional personnel in this District. The foregoing facts confirm that WaveMaker's Plano facility satisfies the requirements of 28 U.S.C. § 1400(b).

43.    As set forth above, WaveMaker sells and offers to sell its infringing products and services to customers throughout the United States, including in this District, and derives substantial revenue therefrom. Defendant also has authorized sellers, channel partners, and sales representatives that offer for sale and sell infringing products to consumers throughout Texas and in this District.

44.    All allegations and support thereof regarding jurisdiction herein are hereby incorporated by reference for the purposes of venue.

45.    With respect to acts of infringement, WaveMaker commits acts of patent infringement within the Eastern District of Texas by making, using, offering, selling, and providing its infringing products and services including without limitation the following: Web Studio, React Native Studio, AutoCode, DevX, UX Design, Cloud Platform, and Security. Residents and businesses in the Eastern District of Texas access and utilize these infringing services, and WaveMaker derives revenue from such use.

**THE PATENTS-IN-SUIT**

46.    On November 14, 2023, United States Patent No. 11,816,459 B2 ("the '459 Patent"), entitled "Graphical User Interface Programming System," was duly and legally issued

by the USPTO. A true and correct copy of the '459 Patent is attached hereto as Exhibit A. The '459 Patent claims patent-eligible subject matter and is presumed valid and enforceable under 35 U.S.C. § 282. Native Pixel Inc. is the exclusive owner by assignment of all rights, title, and interest in the '459 Patent, including the right to bring this suit for injunctive relief and damages, and including the right to sue and recover all past, present, and future damages for infringement of the '459 Patent. Defendant does not have a license to the '459 Patent, either expressly or implicitly, nor does Defendant enjoy or benefit from any rights in or to the '459 Patent whatsoever.

47.    On October 15, 2024, United States Patent No. 12,118,335 B2 ("the '335 Patent"), entitled "GUI Generation System," was duly and legally issued by the USPTO. A true and correct copy of the '335 Patent is attached hereto as Exhibit B. The '335 Patent claims patent-eligible subject matter and is presumed valid and enforceable under 35 U.S.C. § 282. Native Pixel Inc. is the exclusive owner by assignment of all rights, title, and interest in the '335 Patent, including the right to bring this suit for injunctive relief and damages, and including the right to sue and recover all past, present, and future damages for infringement of the '335 Patent. Defendant does not have a license to the '335 Patent, either expressly or implicitly, nor does Defendant enjoy or benefit from any rights in or to the '335 Patent whatsoever.

48.    Plaintiff has complied with the requirements of 35 U.S.C. § 287 for the Asserted Patents.

49.    Representative claim charts showing a sample of infringement of one claim of each of the Patents-in-Suit by the Accused Products are appended to this Complaint as Exhibits C-D.

**ACCUSED INSTRUMENTALITIES**

50.    Defendant makes, uses, sells, offers to sell, tests, designs, and distributes its low-code, AI-augmented application development platform and related tools, services, and

technologies. More specifically, Defendant makes, uses, sells, offers to sell, tests, designs, distributes its infringing products and services—including without limitation AutoCode, SDLC Agents (Design-to-Code, API Integration, Security Config), Agentic App Generation Platform (Two-Pass/WML), CoPilot, AIRA (Agentic Development Framework), WaveMaker React Native Studio, Web Studio, WaveMaker AppChef, WaveMaker Low Code Platform, WaveMaker Enterprise (WME), API/Database Auto-Generation Services, API Designer, DevX, UX Design, Cloud Platform, Security, WaveMaker AI Platform (including its Agentic AI capabilities), WaveMaker UI Kit, WaveXD, Prefabs, Prefab Component System / Repository, Theme Builder, MyStudio, Style Workspace (Design Token Management), Mockingbird (API Mocking Tool), Expert/Professional Services, WaveMaker White Label/Custom Studio, and all enterprise modernization, white-label, and ISV solutions built upon or incorporating the foregoing (herein referred to as the "Accused Products" or "Accused Instrumentalities"). The Accused Instrumentalities specifically include all products and services (including but not limited to software, hardware, network architectural design) manufactured, used, tested, sold, or offered to sell by or on behalf of Defendant practicing the Patents-in-Suit and all processes employed by Defendant that infringe the Patents-in-Suit, including without limitation the foregoing.

51.    Defendant has knowingly (since at least the date of this Complaint) and willfully infringed the Patents-in-Suit, and has intentionally and actively aided, abetted, and induced others to directly infringe each of the Patents-in-Suit (such as its customers in this District and throughout the United States).

## COUNT I
## PATENT INFRINGEMENT OF THE '459 PATENT

52.    Plaintiff restates and realleges the preceding paragraphs of this Complaint, which are incorporated by reference as if fully restated herein.

53.    Defendant, under 35 U.S.C. § 271(a), directly, literally, and/or under the doctrine of equivalents, has infringed and continues to infringe one or more claims of the '459 patent, by making, using, testing, selling, and/or offering for sale in the United States Defendant's Accused Products.

54.    Defendant also indirectly infringed the '459 patent by actively inducing the direct infringement by third parties under 35 U.S.C. § 271(b), at least as of the date of this Complaint.

55.    Defendant knowingly (since at least the date of this Complaint), intentionally, and actively aided, abetted, and induced others to directly infringe at least one claim of the '459 patent (such as its customers in this District and throughout the United States).

56.    Defendant contributorily infringed because, with knowledge of the '459 patent (since at least the date of this Complaint), Defendant supplied a material part of a claimed combination, where the material part was not a staple article of commerce and was incapable of substantial non-infringing use.

57.    Defendant contributed to its customers' infringement because, with knowledge of the '459 patent (since at least the date of this Complaint), Defendant supplied the technology that allowed its customers to infringe the '459 patent.

58.    Defendant has had knowledge (since at least the date of this Complaint) that its activities concerning the Accused Products infringed one or more claims of the '459 patent.

59.    Defendant's customers, such as consumers or end users, actually infringed claims of the '459 patent by using the Accused Products in the manner prescribed by Defendant, and as such, Defendant's customers are direct infringers.

60.    Further, Defendant provides information and technical support to its customers, including promotional materials, product manuals, brochures, videos, demonstrations, and website

materials encouraging its customers to purchase and instructing them to use Defendant's Accused Products (which are acts of direct infringement of the '459 patent).

61.    Alternatively, Defendant knows and/or will know that there is a high probability that the distribution, sale, offer for sale, and use of the Accused Products constitutes direct infringement of the '459 patent but took deliberate actions to avoid learning of these facts.

62.    On information and belief, Defendant has known that its activities concerning the Accused Products infringed one or more claims of the '459 patent since at least the date of this Complaint.

63.    On information and belief, Defendant's Accused Products were available to businesses and individuals throughout the United States and in the State of Texas, including in this District.

64.    Defendant caused Native Pixel irreparable injury and damage by infringing one or more claims of the '459 patent.

65.    Defendant's infringement of the '459 patent after the date of this Complaint is willful and merits increased damages.

66.    Representative claim chart attached hereto as **Exhibit C** describes how the elements of exemplary claim 6 of the '459 patent are infringed by one or more of the Accused Products. While this chart specifically addresses the functionality of one product, the chart is illustrative rather than exhaustive and is representative of, and applies to, all Accused Instrumentalities because all the Accused Instrumentalities infringe in the same general way. This provides details regarding only one example of Defendant's infringement, and only as to a single patent claim, and Plaintiff reserves its right to provide greater detail and scope via its Infringement Contentions at the time required under this Court's scheduling order.

## COUNT II
## PATENT INFRINGEMENT OF THE '335 PATENT

67. Plaintiff restates and realleges the preceding paragraphs of this Complaint, which are incorporated by reference as if fully restated herein.

68. Defendant, under 35 U.S.C. § 271(a), directly, literally, and/or under the doctrine of equivalents, has infringed and continues to infringe one or more claims of the '335 patent, by making, using, testing, selling, and/or offering for sale in the United States Defendant's Accused Products.

69. Defendant also indirectly infringed the '335 patent by actively inducing the direct infringement by third parties under 35 U.S.C. § 271(b), at least as of the date of this Complaint.

70. Defendant knowingly (since at least the date of this Complaint), intentionally, and actively aided, abetted, and induced others to directly infringe at least one claim of the '335 patent (such as its customers in this District and throughout the United States).

71. Defendant contributorily infringed because, with knowledge of the '335 patent (since at least the date of this Complaint), Defendant supplied a material part of a claimed combination, where the material part was not a staple article of commerce and was incapable of substantial non-infringing use.

72. Defendant contributed to its customers' infringement because, with knowledge of the '335 patent (since at least the date of this Complaint), Defendant supplied the technology that allowed its customers to infringe the '335 patent.

73. Defendant has had knowledge (since at least the date of this Complaint) that its activities concerning the Accused Products infringed one or more claims of the '335 patent.

74. Defendant's customers, such as consumers or end users, actually infringed claims of the '335 patent by using the Accused Products in the manner prescribed by Defendant, and as such, Defendant's customers are direct infringers.

75. Further, Defendant provides information and technical support to its customers, including promotional materials, product manuals, brochures, videos, demonstrations, and website materials encouraging its customers to purchase and instructing them to use Defendant's Accused Products (which are acts of direct infringement of the '335 patent).

76. Alternatively, Defendant knows and/or will know that there is a high probability that the distribution, sale, offer for sale, and use of the Accused Products constitutes direct infringement of the '335 patent but took deliberate actions to avoid learning of these facts.

77. On information and belief, Defendant has known that its activities concerning the Accused Products infringed one or more claims of the '335 patent since at least the date of this Complaint.

78. On information and belief, Defendant's Accused Products were available to businesses and individuals throughout the United States and in the State of Texas, including in this District.

79. Defendant caused Native Pixel irreparable injury and damage by infringing one or more claims of the '335 patent.

80. Defendant's infringement of the '335 patent after the date of this Complaint is willful and merits increased damages.

81. Representative claim chart attached hereto as **Exhibit D** describes how the elements of exemplary claim 19 of the '335 patent are infringed by one or more of the Accused Products. While this chart specifically addresses the functionality of one product, the chart is illustrative

rather than exhaustive and is representative of, and applies to, all Accused Instrumentalities because all the Accused Instrumentalities infringe in the same general way. This provides details regarding only one example of Defendant's infringement, and only as to a single patent claim, and Plaintiff reserves its right to provide greater detail and scope via its Infringement Contentions at the time required under this Court's scheduling order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Native Pixel Inc. respectfully requests the following relief:

A. A judgment that Defendant has directly infringed literally and/or under the doctrine of equivalents and continues to directly infringe the Patents-in-Suit set forth in this Complaint;

B. A judgment that Defendant has, since at least the date of this Complaint, actively induced infringement and continues to induce infringement of the Patents-in-Suit set forth in this Complaint;

C. A judgment that Defendant has, since at least the date of this Complaint, contributorily infringed and continues to contributorily infringe the Patents-in-Suit set forth in this Complaint;

D. A judgment and order requiring Defendant to pay Plaintiff damages under 35 U.S.C. § 284, including without limitation both convoyed and derivative sales, as well as supplemental damages for any continuing post-verdict infringement through entry of the final judgment with an accounting as needed;

E. A judgment that Defendant's infringement since at least the date of this Complaint of each of the Patents-in-Suit is willful;

F.   A judgment that Defendant's infringement warrants enhanced damages pursuant to 35 U.S.C. § 284 and application of such damages;

G.   A judgment that this is an exceptional case within the meaning of 35 U.S.C. § 285 and Plaintiff is therefore entitled to reasonable attorneys' fees;

H.   A judgment granting a preliminary and permanent injunction preventing WaveMaker and its officers, directors, agents, servants, employees, attorneys, licensees, divisions, parents, subsidiaries, successors, assigns, and all those in privity, concert, or participation with any of them, from directly or indirectly engaging in infringing activities with respect to the Patents-in-Suit;

I.   An accounting for acts of infringement and supplemental damages for infringement and/or damages not presented at trial, including, without limitation, pre-judgment and post-judgment interest on the damages awarded;

J.   A judgment and order awarding an ongoing royalty;

K.   A judgment and order awarding Plaintiff costs associated with bringing this action;

L.   All equitable relief the Court deems just and proper; and

M.   Such other relief which may be requested and to which the Plaintiff is entitled.

## JURY TRIAL DEMANDED

Pursuant to FED. R. CIV. P. 38, Plaintiff Native Pixel Inc. hereby demands a trial by jury on all issues so triable.

24

Date: March 16, 2026

Respectfully Submitted,

//s/ Erick S. Robinson
Erick S. Robinson (Lead Counsel)
Texas Bar No. 24039142
Gregory Love
Texas Bar No. 24013060
CHERRY JOHNSON SIEGMUND JAMES PC
104 E Houston Street, Suite 115
Marshall, Texas 75670
Tel: (713) 498-6047
Fax: (713) 583-9737
erobinson@cjsjlaw.com
glove@cjsjlaw.com

Mark D. Siegmund
Texas Bar No. 24117055
"Grace" Shuya Yang
Texas Bar No. 24144144
CHERRY JOHNSON SIEGMUND JAMES PC
Bridgeview Center
7901 Fish Pond Road, 2nd Floor
Waco, Texas 76710
Tel: (254) 732-2242
Fax: (866) 627-3509
msiegmund@cjsjlaw.com
gyang@cjsjlaw.com

Ari Rafilson
Texas Bar No. 24060456
Ryan Loveless
Texas Bar No. 24036997
CHERRY JOHNSON SIEGMUND JAMES PC
One Glen Lakes Tower
8140 Walnut Hill Lane, Suite 105
Dallas, Texas 75231
Tel: (972) 987-0709
Fax: (866) 627-3509
arafilson@cjsjlaw.com
rloveless@cjsjlaw.com

***Attorneys for Plaintiff***
***NATIVE PIXEL INC.***